ciprocal treaties to be exempt from discriminating duties, &c., shall be subject to pay, in addition to the duties imposed by this act, ten per centum ad valorem."

It is admitted, that Spain has no such treaty as is mentioned in the section, and hence there is no difficulty in imposing this discrimination against her in all cases where the section applies. But no one of the articles in this importation except "lead in bars" is charged with a duty in the two preceding sections, or in any other section, of the act; and, therefore, the 3d section, imposing the ten per cent., according to its very terms, does not apply. The words are: "in addition to the duties imposed by this act, ten per centum ad valorem."

The 1st section imposes "on lead in pigs or bars" a duty of one dollar and fifty cents per one hundred pounds. The 3d section applies, therefore, to this article, the Spanish vessel not being exempt by treaty from the discrimination which, in addition to the above rate, charges it with the ten per cent. ad valorem.

Wool is charged with a duty, under the 12th section of the act of March 2, 1861 (12 Stat. 183), and goat skins and cotton are charged with duties under the 8th section of the act of July 14, 1862 (Id. 550). That section provides, that, from and after the 1st day of August, 1862, "in lieu of the duties heretofore imposed by law on the articles hereinafter mentioned, and on such as may now be exempt from duty, there shall be levied, &c., the following duties, &c.: on cotton, one half cent per pound;" "on hides, raw, and skins of all kinds, &c., ten per centum ad valorem." Before this, the duty on "raw hides and skins of all kinds" was five per cent., under the 10th section of the act of March 2, 1861 (12 Stat. 183); and, under the 23d section of the same act, cotton was free of duty. Whether, therefore, we look to the 3d section of the act of August 5, 1861, which subjects the articles, under the circumstances stated in the section, to a duty of ten per cent., in addition to that imposed by the act in the previous sections; or, to the 8th section of the act of July 14, 1862, which imposes the duty in lieu of the duties theretofore imposed by law, it is quite clear, that the discriminating duty in question does not apply to the articles of wool, goat skins, or cotton.

The difficulty appears to me insuperable, to undertake to apply the 3d section of the act of August 5, 1861, to the article of wool, which is subjected to duty under the act of March 2, 1861, or to the articles of goat skins and cotton, which are charged with duty under the act of July 14, 1862, when, by the very terms of such 3d section, the additional duty there imposed is in addition to the duty fixed by that act, of which the section is a part. If the language used had been, as in some of the sections of the act of July 14, 1862, "in addition to the duties heretofore imposed by law," or, if the section had used language, which has never yet been used, I think, in any tariff act, "in addition to the duties that may hereafter be imposed by law," the construction claimed by the government might very well be sustained. But no such language is used. On the contrary, the language is, as we have seen, "in addition to the duties imposed by this act."

## Case No. 4,263.

### The ECHO.

[7 Ben. 70.][1]

District Court, S. D. New York. Dec., 1873.

E. H. Owen, for libellants.
W. R. Beebe, for claimant.

BLATCHFORD, District Judge. Assuming it to be true, as alleged in the libel, that, at the time of the injury to the brig, the tug was under the sole control of the master and crew of the tug, and that the master and crew of the brig took no part in the work of moving her, except as they were directed by the master of the tug, I am not satisfied that the libellants have made out the charge of the libel, that, in moving the brig, those navigating the tug conducted the business so carelessly, negligently, and improperly, that the brig received the injury which happened to her. The weight of the evidence is, that it was the parting of the hawser between the brig and the tug which caused the rigging of the brig to foul with the yard of the bark. For the condition and strength of that hawser, the tug was not,

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

as between herself and the brig, responsible, in the event of injury to the brig from the weakness of such hawser, whatever might have been the responsibility of the tug for the strength of such hawser, as between herself and vessels other than the brig, in the event of injury to them from the weakness of such hawser. The brig must bear herself all loss occurring to herself from the parting of such hawser, as it is not shown to have parted through any negligence on the part of the tug.

The libel must be dismissed, with costs.

## Case No. 4,264.

### The ECHO.

[3 Ware, 289.] [1]

District Court, D. Maine. Nov., 1861.

Mr. Fox, for libellant.
Mr. O'Donnell, for claimant.

WARE, District Judge. A collision took place in Portland harbor between the Echo, a fishing schooner of about 54 tons burthen, on the night of Nov. 2, and the Nettle. Neither vessel had a man on board at the time of the accident. The Nettle, which was used as a pilot boat, was safely moored at her usual anchorage and fitted with everything requisite for her employment. In the course of the trial no fault has been found with this vessel. She remained in her place and was sunk by the Echo, where she was anchored, and she is acquitted of all blame. The Echo was a fishing schooner, and arrived from a trip to the shore fishery Friday about 8 o'clock in the evening. She had a crew of four men and a boy, and these all remained on board from Friday evening until Saturday at three o'clock p. m. Then the weather being threatening they let go an additional anchor and all went ashore. The crew dispersed to their several places of residence, and the master. Wallace, a young man, at eight o'clock Saturday evening left his residence for the purpose of going on board the vessel and remaining through the night. But such at that time was the state of the weather, that, though he made the attempt, he was unable to succeed in getting on board, and after making fruitless attempts to get assistance, he could find no one who was willing to trust himself in the boat, and finally gave up the attempt. He remained on the wharf until 11 o'clock and then went to his house. He returned as soon as it was light the next morning. In the meantime the Echo had dragged her anchor and the mischief was done.

The first fault found with the Echo is, that she was left through the night with no one aboard. But it was proved at the trial, that in this port it is customary to leave fishing vessels at anchor over night without a man on board. Some masters, of more than ordinary vigilance, may have at all times some one aboard to look after and take care of the vessel; but in good weather this is not the general custom. But this custom extends to, and can only be justified in ordinary weather, and at this time a storm had commenced and the elements were threatening. A more than ordinary care was therefore required. But this vessel was not finally abandoned. The master only left it temporarily for his supper, intending to return on board himself and to remain. He returned about eight o'clock, but in the mean time the wind had increased and he was unable to reach it. I am satisfied from the evidence, that Wallace acted in good faith when he left the Echo and when he attempted to return, and was only prevented by the elements; and that he made every exertion that could reasonably be expected. In my opinion his leaving for the short time, though the weather was in a critical state, was not a great fault on his part, not such an one that all the misfortune of the night ought to be borne by him. He stated very plainly in his examination, that if he had been aboard he should have given more scope to the anchors; and that they had not more is one of the complaints against this vessel. Though the evidence on this subject is somewhat contradictory, as to the sufficiency of the scope, I am satisfied, that if more had been given, the vessel would have rode out the storm with more safety and ease. But the real question in this case is not what ought to be given for the purpose of encountering one of the severest gales we ever have, but whether it was sufficient for the time the master intended to be absent. The cables were measured after the gale, and one had eighteen fathoms and a fraction and one had twenty-one. This, though the weather was threatening, was, I think, sufficient for the time the master intended to be absent. If the master could be justified in leaving for a short time, I think he could also

[1] [Reported by George F. Emery, Esq.]